IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

BRYAN MCCLURKIN,

Plaintiff,

v.

Case No. 3:17-CV-01228-NJR

JOHN BALDWIN, S.A. GODINEZ,
KIMBERLY BUTLER, GAIL WALLS,
MIKE NELSON, CHARLOTTE MIGET,
DR. FUENTES, MARTHA M. OAKLEY,
M. MOLDENHAUER, LISA TINDALL,
B. RUPPERT, and DR. J. TROST,

Defendants.

## MEMORANDUM AND ORDER

ROSENSTENGEL, Chief Judge:

Pending before the Court are two motions for summary judgment. Defendants Dr. Fe Fuentes, Michael Moldenhauer, Lisa Tindall, Belinda Ruppert, and Dr. John Trost ("Wexford Defendants") filed a motion for summary judgment on April 2, 2021 (Doc. 206). Defendants John Baldwin, S.A. Godinez, Kimberly Butler, Gail Walls, Mike Nelson, Charlotte Miget, and Martha M. Oakley ("IDOC Defendants") filed a motion for summary judgment on July 1, 2021 (Doc. 218). For the reasons set forth below, both motions are granted.

### INTRODUCTION

On November 9, 2017, Plaintiff Bryan McClurkin, an inmate in custody of the Illinois Department of Corrections ("IDOC"), filed this action *pro se* pursuant to 42 U.S.C. § 1983 alleging his constitutional rights were violated while he was incarcerated at Menard Correctional Center ("Menard") (Doc. 1). McClurkin filed two subsequent amended complaints on November 30, 2017 and July 12, 2018 respectively (Docs. 11, 77). While initially

proceeding *pro se*, counsel was appointed for McClurkin on October 3, 2019 (Doc. 150).

Currently, McClurkin resides at Stateville Correctional Center ("Stateville"), but his allegations concern medical treatment during his incarceration at Menard (Doc. 77). McClurkin's allegations relate to the lack of adequate medical attention from 2014 to 2017 for chronic pain stemming from a fall during a Tactical Team "shakedown" at Menard and his ongoing osteoarthritis (*Id.*). Defendants, with the exception of Defendant Nelson, filed summary judgment motions regarding McClurkin's failure to exhaust his administrative remedies (Docs. 79, 81, 100). The motions were denied (Doc. 128).

McClurkin proceeds on one count under the Eighth Amendment alleging all defendants were deliberately indifferent towards his serious medical needs (Docs. 12, 76). At the time of the underlying events, the Wexford Defendants were employed at Menard as follows: Michael Moldenhauer as a nurse practitioner, Dr. John Trost as a physician and site medical director, Lisa Tindall as a nurse practitioner, Dr. Fe Fuentes as a physician, and Belinda Ruppert as an x-ray technician (Doc. 207). The IDOC Defendants held the following positions at Menard during the relevant time period: Mike Nelson as a medical technician, Martha Oakley as a nurse, Charlotte Miget as a nursing supervisor, Gail Walls as the Director of Nursing and Healthcare Unit Administrator, Kimberly Butler as Warden, S.A. Godinez as Director of IDOC then Acting Director from May 2011 to March 2015, and John Baldwin as the Acting Director of IDOC from August 2015 to May 2019 (Doc. 220).

McClurkin filed a timely response to both the Wexford Defendants' and IDOC Defendants' motions for summary judgment (Docs. 221, 222). The Wexford Defendants filed a timely reply to McClurkin's response (Doc. 223).

In their motion for summary judgment, the Wexford Defendants argue that

McClurkin has not set forth any evidence demonstrating that they were deliberately indifferent to his medical needs. The Wexford Defendants also contend that McClurkin's claims fail because his various health issues from 2014 to 2017 were evaluated and treated based on each provider's professional judgment.

Similarly, the IDOC Defendants argue they are entitled to summary judgment because McClurkin has failed to demonstrate that they were deliberately indifferent to his medical needs (Doc. 218). The IDOC Defendants also assert qualified immunity as a defense to all claims (*Id.*).

## FACTUAL BACKGROUND

The records of medical treatment are extensive in this case because McClurkin alleges inadequate medical care over a period of three years regarding pain across several regions of his body.

McClurkin alleges that, during a tactical team shakedown in the auditorium at Menard on April 8, 2014, his chair collapsed causing him to hit his shoulder and lower neck on a metal bar and land on his handcuffed wrists (Doc. 77). He alleges that this incident caused his chronic pain (*Id.*). Immediately after the fall, McClurkin felt pain and sought medical attention (*Id.*). Defendant Nelson, a medical technician present in the auditorium, took McClurkin's blood pressure, examined his body for injury, and told him there would be follow-up care (Doc. 220-1, p. 37). McClurkin estimated that, at the time of his injury, his pain was a four out of ten (*Id.* at p. 34). Nelson noted that McClurkin was not hurt after the fall, and if he was, Nelson says he would have escorted McClurkin to the healthcare unit, which he did not (Doc. 220-3, p. 34).

Two days later, McClurkin filed an emergency grievance (*Id.* at pp. 51-52). A week passed without a response, so he filed another emergency grievance with Defendant Butler (*Id.* at p. 35). Butler expedited McClurkin's grievance as an emergency and sent the grievance to a grievance officer, who investigated and recommended it be found "moot" because Defendant Dr. Fuentes had just examined McClurkin (*Id.* at p. 34). Butler concurred in the officer's finding (*Id.*).

Dr. Fuentes first evaluated McClurkin two weeks after the initial incident. She discussed McClurkin's fall and injury and prescribed Naproxen twice a day for two weeks (Doc. 209, p. 33). She also advised McClurkin to follow-up in sick call if his pain persisted. Just two days later, McClurkin was seen in sick call regarding the shoulder and neck pain (*Id.* at p. 35). He was also seen two weeks later on May 11, 2014, by Defendant Oakley, a nurse (*Id.* at p. 36). Oakley noted a slight impairment to the range of motion in the neck, but no other limitations in range of motion (*Id.*). She observed no bruising, redness, or swelling, but McClurkin reported tenderness to the touch (*Id.*). Oakley referred McClurkin to the MD call line, so he could be evaluated by a physician (*Id.*). On May 30, 2014, McClurkin saw a physician[1] and reported that the Naproxen was "not working" (*Id.* at p. 38). The physician observed a good range of motion and prescribed Motrin for one month (*Id.*).

McClurkin complained of neck and upper back pain in nurse sick call on June 17, 2014 (Doc. 220-2, p. 35). He stated that his symptoms started during the collapsing chair incident,

---

[1] The medical records and motions are unclear as to the treating physician on this date. The IDOC Defendants' motion for summary judgment indicates that this visit was with Dr. Fuentes (Doc. 220), but the Wexford Defendants' motion for summary judgment indicates that Dr. Fuentes only saw McClurkin once in April 2014 (Doc. 207). The medical records are illegible as to the treating physician's name (Doc. 209, p. 38).

and his pain level was a seven out of ten (*Id.*). The nurse referred him to the MD call line (*Id.*). Defendant Moldenhauer, a nurse practitioner, evaluated McClurkin on June 20, 2014, and he noted that McClurkin had difficulty ambulating and complained of occasional numbness in his right leg and in his finger (Doc. 209, p. 41). Moldenhauer ordered x-rays of McClurkin's cervical and thoracic spine and told McClurkin to follow-up in two weeks to review the results (*Id.*).

Four days later, Defendant Ruppert performed the x-ray, and results showed the alignment of McClurkin's cervical, thoracic, and lumbar spine was within normal limits (*Id.*; Doc. 210, p. 187). The report also listed "degenerative change" in McClurkin's spine, which indicated osteoarthritis according to Moldenhauer (Doc. 210, p. 187; Doc. 207-2, ¶ 9). On July 3, 2014, McClurkin visited Moldenhauer for a follow-up (Doc. 209, p. 45). During this visit, the x-ray results could not be reviewed as they were not yet returned (*Id.*). The visit notes indicate that McClurkin's shoulder displayed good range of motion, and McClurkin reported improvement in his hip and back (*Id.*). For his ongoing shoulder pain, Moldenhauer prescribed Tylenol and follow-up as needed (*Id.*).

In mid-September, McClurkin filed a grievance requesting an MRI despite never being told he needed an MRI (Doc. 220-1, p. 59; 220-4, p. 11). A couple weeks later, Defendant Miget reviewed McClurkin's request and determined that his recent x-ray and nurse practitioner visits did not indicate a need for an MRI (Doc. 220-4, p. 10). In mid-October, McClurkin wrote another letter to a grievance officer complaining of numbness in his left arm and stating his injury was spreading (Doc. 222-1, p. 10).

The Administrative Review Board ("ARB") reviewed McClurkin's grievance from April 17, 2014 and subsequently denied it because McClurkin had been receiving ongoing

medical attention (Doc. 220-3, p. 30). Defendant Godinez concurred in the ARB response (*Id.*). McClurkin also appealed his grievance dated September 22, 2014, and the grievance officer recommended it be found moot because McClurkin had been receiving treatment (Doc. 220-4, p. 1). Butler concurred with the recommendation (*Id.*).

McClurkin's next report of pain came almost nine months later on March 5, 2015 (Doc. 209, p. 58). Medical notes evidence that McClurkin complained of left shoulder, neck, and arm pain and finger numbness and tingling (*Id.*). He also reported that Ibuprofen was not working to treat the pain (*Id.*). The treating nurse referred McClurkin to the MD call line, provided Ibuprofen, and instructed him to avoid heavy lifting and other strenuous activity (*Id.*).

Four days later, McClurkin saw Defendant Dr. Trost who examined the areas of reported pain, noted McClurkin was neurologically intact, prescribed Naproxen for six months, and ordered another x-ray of the cervical spine and left shoulder (*Id.* at p. 59). The x-ray results showed no fracture or significant arthritic change in the left shoulder (Doc. 210, p. 188). The images taken of the cervical spine showed degenerative changes with mild to moderate hypertrophic spurring, no fracture, and no acute bony abnormality (*Id.*). After reviewing the report, Dr. Trost determined the degenerative changes indicated osteoarthritis and decided that without an acute injury follow-up was unnecessary (Doc. 207-3, pp. 28-30).

In June 2015, McClurkin reported knee pain that grew worse with physical activity and saw Dr. Trost again, who prescribed Naproxen for six months as needed (Doc. 209, p. 65). Just over a month later, McClurkin reported his persistent knee pain to nurse sick call and received Ibuprofen along with a referral to the MD call line (*Id.* at p. 67). Knee x-rays were ordered a month and a half later. The x-rays were taken by Ruppert and showed no acute

fracture, dislocation, or joint effusion, but evidenced mild to moderate osteoarthritic changes, bone spurs, and a fabella at the posterior left knee (Doc. 210, p. 189). In October 2015, McClurkin reported to sick call for left knee pain, which he described as a ten out of ten on a pain scale (Doc. 209, p. 72). He received a knee sleeve, cold pack, and Ibuprofen (*Id.*).

After several months passed, in late July 2016, McClurkin was next seen for an emergency visit at Menard for left leg pain and was referred to the MD call line (*Id.* at p. 77). Two days later, McClurkin saw Defendant Tindall, a nurse practitioner, for his leg pain that started two weeks prior (*Id.* at p. 81). Along with his high levels of pain, McClurkin complained of loss of sensation and numbness in his back (*Id.*). Tindall ordered left hip and lumbosacral spine x-rays, prescribed Tramadol (a narcotic pain reliever) and Robaxin (a muscle relaxant) to manage the pain, and ordered medical lay-in for a week (*Id.*). The x-rays were taken the next day (Doc. 210, pp. 190-191). The results indicated no acute fracture or dislocation and mild joint space narrowing at the left hip and lumbar spine which was likely degenerative (*Id.*).

A couple weeks later, McClurkin went to sick call for back pain and was referred to the MD call line again (Doc. 209, p. 83). Moldenhauer evaluated McClurkin within a few days (*Id.* at p. 85). McClurkin reported that his left leg and left hip pain felt as if they were "on fire" (*Id.*). Moldenhauer prescribed Naproxen for a month, sent a request for a lower-back MRI to collegial review, and ordered a medical lay-in for two weeks (*Id.*). The next day, Dr. Trost presented the MRI referral to collegial review (Doc. 210, p. 7). A non-defendant reviewing physician denied the request for an MRI and recommended an alternative treatment of plain film x-rays and a physical therapy evaluation (*Id.*).

During this time, McClurkin reported that he was in extreme pain, and he could not stand or walk (Doc. 222-1, p. 11; Doc. 222-2, pp. 78-80). According to McClurkin, the lack of mobility persisted for about two months (Doc. 222-2, pp. 80-81).

In September 2016, McClurkin saw an outside physical therapist for consultation and then received a regimen of exercises to perform daily at Menard (Doc. 209, p. 90; Doc. 220-1, p. 93). A few days later, Moldenhauer followed up, and McClurkin did not voice any complaints (Doc. 220-2, p. 75). Medical notes indicate that McClurkin completed his home exercises under supervision on seven occasions in October and three occasions in November (*Id.* at pp. 77-84). McClurkin alleges that his physical therapy consisted of performing stretches on a dirty, hard tile floor of the Healthcare Unit waiting area and within the confines of his small cell (Doc. 222-2, pp. 94-96)

In mid-October of 2016, another x-ray showed mild multilevel degenerative disc disease which had remained stable since March 2015 (Doc. 210, p. 192). In mid-November, after eight weeks of ineffective physical therapy, Dr. Trost appealed the alternative treatment plan and renewed the request for an MRI (*Id.* at p. 8). In mid-December, an MRI was performed on McClurkin's cervical and lumbar spine (*Id.* at p. 12). The MRI showed no fracture, edema, soft disc herniation, acute soft tissue abnormalities, or pathological enlarged lymph nodes (*Id.* at p. 14). The spinal column appeared normal (*Id.* at p. 15). The results further indicated severe left foraminal narrowing and degenerative changes (*Id.*).

McClurkin filed another grievance requesting a transfer and an MRI on October 17, 2016, which was reviewed by Defendant Walls (Doc. 220-3, pp. 4, 26). Walls indicated that she could not transfer McClurkin and could not override the decision in collegial review regarding an MRI (*Id.* at p. 26). In November 2016, McClurkin again wrote to the ARB

explaining his ongoing symptoms and requesting a transfer (Doc. 222-1, pp. 17-18). This grievance letter was subsequently denied as moot (*Id.*).

According to Dr. Trost, the degenerative changes present in McClurkin's x-rays were consistent with osteoarthritis (Doc. 207-3, pp. 52-53). Dr. Trost referred McClurkin to an orthopedic surgeon who evaluated him in May 2017 (Doc. 210, p. 31). After the MRI, the ARB reviewed McClurkin's October 17, 2016 grievance and recommended it be found moot because McClurkin had received an MRI and was scheduled to see an orthopedic surgeon (Doc. 220-3, p. 2). Defendant Baldwin concurred in the recommendation (*Id.*). The orthopedic surgeon determined that McClurkin's symptoms, at the time, were not severe enough to warrant surgery, but if his symptoms worsened McClurkin may be a candidate for spinal decompression surgery in the future (*Id.* at pp. 24, 31).

McClurkin eventually transferred to Stateville in late 2017 (Doc. 221-2, p. 113). He began participating in physical therapy and reported positive results and pain relief (*Id.* at p. 114).

LEGAL STANDARD

## I.      <u>Summary Judgment</u>

Summary judgment is proper only if the moving party can demonstrate that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Ruffin Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). The moving party bears the burden of establishing that no material facts are in genuine dispute; any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970); *see also Lawrence v. Kenosha Cty.*, 391 F.3d 837, 841

(7th Cir. 2004).

Once the moving party sets forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex*, 477 U.S. at 322-24. A moving party is entitled to judgment as a matter of law where the nonmoving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323. The party opposing summary judgment must offer admissible evidence in support of his version of events; hearsay evidence does not create a genuine issue of material fact. *Durling v. Menard, Inc.*, No. 18 C 4052, 2020 WL 996520, at *2 (N.D. Ill. Mar. 2, 2020) (citing *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 484 (7th Cir. 1996)). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the nonmovant. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[i]nferences that rely upon speculation or conjecture are insufficient." *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (citation omitted).

## II.   Eighth Amendment Deliberate Indifference to Medical Needs

"[D]eliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A prisoner is entitled to "reasonable measures to meet a substantial risk of serious harm"—not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). A prisoner's dissatisfaction with a medical professional's prescribed course of treatment does

not give rise to a successful deliberate indifference claim unless the treatment is so "blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (quoting *Thomas v. Pate*, 493 F.2d 151, 158 (7th Cir. 1974)). "[T]he Eighth Amendment does not reach disputes concerning the exercise of a professional's medical judgment, such as disagreement over whether one course of treatment is preferable to another." *Gaston v. Ghosh*, 11-CV-6612, 2017 WL 5891042, at *11 (N.D. Ill. Nov. 28, 2017) (citing *Cesal v. Moats*, 851 F.3d 714, 721 (7th Cir. 2017)).

To succeed on a claim of deliberate indifference, a plaintiff must show: (1) that he suffered from an objectively serious medical condition; and (2) that the individual defendant was deliberately indifferent to that condition. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (citing *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006)).

A medical condition is objectively serious if "a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)) (internal quotation marks omitted).

Prevailing on the second prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to prisoner health. *Greeno v. Daley,* 414 F.3d 645, 653 (7th Cir. 2005). A plaintiff need not show the individual "literally ignored" his complaint, but that the individual was aware of the condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Something more than negligence or even malpractice is required" to prove deliberate

indifference. *Pyles*, 771 F.3d at 409; *see also Hammond v. Rector*, 123 F. Supp. 3d 1076, 1086 (S.D. Ill. 2015) ("isolated occurrences of deficient medical treatment are generally insufficient to establish . . . deliberate indifference"). Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry*, 604 F.3d at 440 (citing *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)).

Assessing the subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). This is in contrast to a case "where evidence exists that the defendant [ ] knew better than to make the medical decision[ ] that [he] did." *Id*. (quoting *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016)) (alterations in original). A medical professional's choice of an easier, less efficacious treatment can rise to the level of violating the Eighth Amendment, however, where the treatment is known to be ineffective but is chosen anyway. *Berry*, 604 F.3d at 441. A delay in treatment may also show deliberate indifference if it "exacerbated the inmate's injury or unnecessarily prolonged his pain." *Perez v. Fenoglio*, 792 F. 3d 768, 777-78 (7th Cir. 2015). Whether the length of delay is tolerable depends upon the seriousness of the condition and the ease of providing treatment. *Id*. at 778.

**ANALYSIS**

## I.   <u>Wexford Defendants</u>

The Wexford Defendants argue that summary judgment is appropriate because McClurkin has failed to produce sufficient evidence showing that any one of them demonstrated deliberate indifference in addressing his chronic pain.

The Wexford Defendants do not dispute that McClurkin suffered from a serious medical condition. Primarily, they argue that there is no evidence that their alleged actions or inactions deviated so significantly from acceptable professional judgment as to rise to deliberate indifference, and that no evidence shows that they caused McClurkin's osteoarthritis or chronic pain.

McClurkin argues that issues of material fact exist as to whether the Wexford Defendants acted with deliberate indifference. In support of this argument, McClurkin points to the fact that the care he received after his chair collapsed was delayed, did not address his medical condition, and did not alleviate his worsening symptoms. McClurkin contends that the Wexford Defendants persisted for years with a course of treatment that was ineffective despite McClurkin routinely informing Defendants and other medical staff that his pain continued. He states that his chronic pain lasted over three and a half years, and the unknown causation of his pain creates an issue of material fact.

The types of pain and the frequency of sick call complaints varied over the course of McClurkin's treatment at Menard. From April 2014 to March 2015, McClurkin complained of pain in his left shoulder, neck, and upper back with numbness in the right hand, arm, and leg. Within that time, the medical records show a gap from July 2014 to March 2015, during which McClurkin did not see sick call for any pain but did file a few grievances. Next, from June 2015 to October 2015, McClurkin mainly complained of knee pain in both legs. McClurkin then reported lower back, hip, and left leg pain from July 2016 to May 2017. Generally, the records indicate that his chronic pain migrated throughout his body, and he went long periods without seeking medical treatment. Moreover, McClurkin does not offer

evidence that any of the defendants caused his pain rather than his underlying osteoarthritis or the collapsing chair incident.

The Court will address each of the Wexford Defendant's involvement in treating McClurkin's conditions.

### a.  Defendant Michael Moldenhauer

Defendant Moldenhauer evaluated McClurkin on several occasions. In June 2014, he ordered x-rays of McClurkin's cervical and thoracic spine. In July 2014, McClurkin visited Moldenhauer for a follow-up, where Moldenhauer noted McClurkin's shoulder displayed good range of motion and his hip and back showed improvement. Moldenhauer prescribed Tylenol and follow-up as needed. In August 2016, Moldenhauer evaluated McClurkin after complaints of left leg and hip pain. Moldenhauer prescribed Naproxen, sent a request for a lower-back MRI to collegial review, and ordered a medical lay-in for two weeks (*Id.*). In September 2016, Moldenhauer followed up with McClurkin after a physical therapy consultation.

There is no evidence that Moldenhauer knew of and disregarded an excessive risk to McClurkin's health. Conversely, the record shows that Moldenhauer addressed McClurkin's complaints by prescribing pain medications and life-style adjustments, as well as ordering diagnostic tests like x-rays and an MRI. There is no allegation that Moldenhauer delayed McClurkin's medical care and no evidence that he did. On this record, no reasonable jury could find that Moldenhauer was deliberately indifferent to McClurkin's serious medical need, that he demonstrated intentional or criminally reckless conduct, or that his medical decisions substantially departed from accepted professional judgment. *Berry*, 604 F.3d at 440; *Collignon v. Milwaukee Cty.*, 163 F.3d 982, 987-88 (7th Cir. 1998). To the extent that McClurkin

argues that his successful physical therapy treatment at Stateville demonstrates that Moldenhauer should have prescribed a different treatment, the Court disagrees. Moldenhauer appears to have used his medical judgment to treat McClurkin's osteoarthritis. McClurkin offers no evidence that the treatment pursued by Moldenhauer was unreasonable and departed from acceptable professional judgment. As such, he is entitled to summary judgment.

**b.  Defendant Dr. Fe Fuentes**

The medical records are unclear as to whether Defendant Dr. Fuentes evaluated McClurkin on one or two occasions. Dr. Fuentes treated McClurkin on April 22, 2014, two weeks after his collapsing chair incident. Responding to McClurkin's complaints, Dr. Fuentes prescribed Naproxen and instructed him to return to sick call if symptoms persisted. If Dr. Fuentes treated McClurkin again, that visit occurred on May 30, 2014. During that visit, the physician—Dr. Fuentes or someone else—observed a good range of motion and prescribed Motrin.

Whether Dr. Fuentes treated McClurkin on one or both occasions, no reasonable jury could find that she had subjective knowledge of an excessive risk to McClurkin's health, and then disregarded that risk. The records indicate that she evaluated McClurkin and prescribed medication to treat his symptoms. If she conducted the May visit, she also adjusted his medication after McClurkin stated the first type of medication was ineffective. On this record, no evidence supports a finding that Dr. Fuentes was deliberately indifferent to McClurkin's serious medical needs and, thus, she is entitled to summary judgment.

### c.  Defendant Lisa Tindall

The medical records indicate that McClurkin saw Defendant Tindall during only one emergency appointment in August 2016. During that visit, Tindall prescribed pain medication, ordered x-rays, and recommended medical lay-in. From this one visit, Tindall attended to McClurkin's medical concerns and ordered treatment as well as diagnostic tests. Tindall's treatment does not lead to an inference of deliberate indifference. Accordingly, Tindall is entitled to summary judgment.

### d.  Defendant Dr. John Trost

Like Moldenhauer, Defendant Dr. Trost evaluated McClurkin on several occasions. In March 2015, Dr. Trost prescribed pain medication and ordered shoulder and spine x-rays for McClurkin when he complained of left shoulder pain, back pain, and numbness. When McClurkin complained of knee pain in June 2015, Dr. Trost prescribed pain medication. In August 2016, Dr. Trost presented a request for MRI at collegial review, which was denied. After Dr. Trost determined that physical therapy was ineffective, he appealed the denial of the MRI, which was then approved. In May 2017, Dr. Trost referred McClurkin to an orthopedic surgeon for evaluation to assess the need for surgical solutions.

In his deposition, Dr. Trost explained that treating chronic pain from osteoarthritis starts with non-steroidal anti-inflammatory medications to control inflammation and pain. He stated that treatment progresses through x-ray evaluations, physical therapy, MRIs, and potential surgical solutions. McClurkin offers no evidence that this medical treatment plan ran afoul of accepted professional judgment or that McClurkin suffered from an acute injury that Dr. Trost failed to diagnose or treat.

There is no evidence that Dr. Trost knew of and disregarded an excessive risk to McClurkin's health. On the contrary, the record indicates that Dr. Trost treated McClurkin's various ailments on different occasions by prescribing pain medications, ordering diagnostic tests, and adjusting course when alternative options proved ineffective. There is no allegation that Dr. Trost caused a delay in McClurkin's medical care and no evidence that he did. To the extent that McClurkin argues that his successful physical therapy treatment at Stateville demonstrates that Dr. Trost should have pursued a different treatment, the Court disagrees. Dr Trost, just as Moldenhauer, appears to have used his medical judgment to treat McClurkin's osteoarthritis. McClurkin offers no evidence that his treatment plan was unreasonable or departed from acceptable professional judgment. On this record, no reasonable jury could find that Dr. Trost was deliberately indifferent to McClurkin's serious medical need. As such, he is entitled to summary judgment.

### e.   Defendant Belinda Ruppert

Defendant Ruppert, an x-ray technician, was only responsible for performing x-rays ordered for McClurkin. The record does not indicate that Ruppert had other input or control over McClurkin's medical treatment. No reasonable jury could find that Ruppert was deliberately indifferent in simply taking McClurkin's x-rays. In fact, she fulfilled her responsibilities and performed x-rays when they were ordered. There is no evidence of a substantial delay in taking x-rays, and no allegation that Ruppert caused any delay in scheduling or performing the x-rays. Accordingly, Ruppert is entitled to summary judgment.

Upon this record, no reasonable juror could conclude that any Wexford defendant—Michael Moldenhauer, Dr. Fe Fuentes, Lisa Tindall, Dr. John Trost, or Belinda Ruppert—demonstrated deliberate indifference to McClurkin's serious medical needs.

## II.    **IDOC Defendants**

The IDOC Defendants argue that summary judgment is appropriate because they were not deliberately indifferent to McClurkin's serious medical needs. Defendants Baldwin, Butler, Godinez, Miget and Walls argue that they were not personally involved in McClurkin's medical treatment, and appropriately reviewed grievances. Defendants Nelson and Oakley argue they had limited involvement in McClurkin's medical care and treated him appropriately. The IDOC Defendants do not dispute that McClurkin suffered from a serious medical condition. The Court will evaluate each of the IDOC Defendant's involvement in McClurkin's treatment.

### a.    **Defendant S.A. Godinez and John Baldwin**

Defendants Godinez and Baldwin argue that, as Director and Acting Directors of the IDOC, they did not provide any kind of medical treatment—diagnosing patients, prescribing or distributing medications, or creating treatment plans. They also state that they are not trained or licensed physicians and cannot overrule healthcare unit decisions. Moreover, Godinez and Baldwin contend that they are not involved in scheduling medical appointments or ordering diagnostic tests. Godinez and Baldwin are clearly not medical professionals and are in no position to treat any type of medical condition, so it is appropriate for them to defer to the judgment of prison medical staff. *See Berry v. Peterman, 604* F.3d 435, 440 (7th Cir. 2010) (Nonmedical personnel are entitled to defer to the judgment of prison health professionals.). While Godinez and Baldwin cannot ignore medical needs of prisoners and should ensure access to treatment to address serious medical complaints, McClurkin's medical records reflect that he received ongoing medical care for his various instances of pain. By reviewing and subsequently denying the grievances, directly or by signatory,

Godinez and Baldwin did not disregard an excessive risk to McClurkin's health, as nurses and physicians treated McClurkin for his ongoing pain within their medical discretion. Furthermore, by the time Godinez or Baldwin reviewed the grievances, the medical care sought had already been provided.

No reasonable jury could find that Godinez and Baldwin intentionally or recklessly disregarded an excessive risk to McClurkin's health by concurring with the ARB in denying his grievances. Instead, the evidence indicates that they entrusted medical treatment to the professional judgment of prison medical staff. Godinez and Baldwin are entitled to summary judgment.

### b.  Defendant Kimberly Butler

Defendant Butler makes similar arguments regarding her lack of participation in the process of prisoner health care. Butler did have personal knowledge of the chair collapsing incident through review of McClurkin's initial grievances in April 2014.

In his Complaint, McClurkin stated that Butler acknowledged his initial grievance as an emergency, because she expedited it. Once the grievance officer determined the grievance was moot, because McClurkin had seen Dr. Fuentes the same day, Butler signed off as concurring with that finding. Butler also concurred with the grievance officer's recommendation to find McClurkin's grievance dated September 22, 2014 moot. Although she initially expedited the grievance, after the grievance officer investigated, Butler then concurred with a finding of mootness. This concurrence does not show deliberate indifference. Instead, the evidence demonstrates Butler expedited McClurkin's initial grievance after the chair collapse incident, and once she had additional information from the grievance officer that McClurkin had received medical treatment, she updated her

assessment. This does not show that she knew of and disregarded an excessive risk to McClurkin's health. Accordingly, Butler is entitled to summary judgment.

### c.   Defendants Charlotte Miget and Gail Walls

Like the preceding IDOC Defendants, Miget and Walls argue that they did not directly provide medical treatment, prescribe or distribute medications, or create treatment plans. They also contend that they could not order MRIs and were not involved in placing medical holds on prisoners. In assessing grievances, Miget and Walls reviewed both the grievance and the medical records. For McClurkin, they found he was receiving adequate medical care and indicated that if he had ongoing needs, he could request care through the nurse sick call procedure.

Defendants Miget and Walls can also defer to the professional judgment of McClurkin's medical providers. *See Berry*, 604 F.3d at 440. Miget and Walls, however, cannot ignore a prisoner's grievance or request for medical attention. The record does not indicate that either did. Miget and Walls both reviewed McClurkin's grievances and medical records and provided responses indicating their findings. McClurkin argues that because Miget and Walls did not personally speak with the prisoners or their medical providers about the grievances an issue of material fact emerges as to whether they were deliberately indifferent to his medical needs. It is undisputed, however, that Miget and Walls reviewed McClurkin's medical records. McClurkin offers no argument as why review of medical records is insufficient to address the grievances or how it would create an inference of deliberate indifference to solely review medical records. Miget and Walls's actions, or alleged inactions, do not rise to the level of deliberate indifference. Accordingly, Miget and Walls are entitled to summary judgment.

### d.  Defendant Mike Nelson

Defendant Nelson only evaluated McClurkin on the day of the collapsing chair incident in April 2014. Nelson reported to a grievance officer that McClurkin did not state that he was hurt requiring further medical attention, otherwise he would have escorted McClurkin to the healthcare unit. McClurkin, likewise, estimated that at the time of the incident he experienced a four out of ten on a pain scale. The record indicates that Nelson evaluated McClurkin's complaint, checked for an injury, and found no reason to escalate treatment. From this one interaction, there is no evidence that Nelson knew of and subsequently disregarded an excessive risk to McClurkin's health. McClurkin alleges that Nelson promised that someone would follow up with him regarding the incident, but no follow-up ever occurred. Even if Nelson made this promise and failed to follow through, it does not create an inference of deliberate indifference. On this record, Nelson is entitled to summary judgment.

### e.  Defendant Martha M. Oakley

McClurkin's medical records indicate that Defendant Oakley saw him once on May 11, 2014. Oakley noted a slight impairment in the range of motion of McClurkin's neck. She did not observe bruising, redness, or swelling. McClurkin reported tenderness to the touch during this evaluation. Oakley referred McClurkin to the MD call line, so he could be evaluated by a physician. It appears that Oakley addressed McClurkin's concerns and referred him to the MD call line, so his treatment could be escalated for physician evaluation. This one-off treatment does not lead to an inference of deliberate indifference. As such, Oakley is entitled to summary judgment.

Based on this record, no reasonable juror could conclude that any IDOC defendant—S.A. Godinez, John Baldwin, Kimberly Butler, Charlotte Miget, Gail Walls, Mike Nelson, or Martha Oakley—demonstrated deliberate indifference to McClurkin's serious medical needs.

CONCLUSION

For these reasons, the motion for summary judgment filed by Defendants Dr. Fe Fuentes, Michael Moldenhauer, Lisa Tindall, Belinda Ruppert, and Dr. John Trost (Doc. 206) is **GRANTED**. The motion for summary judgment filed by Defendants John Baldwin, S.A. Godinez, Kimberly Butler, Gail Walls, Mike Nelson, Charlotte Miget, and Martha M. Oakley (Doc. 218) is also **GRANTED**. The Clerk of Court is **DIRECTED** to enter judgment and close this case.

**IT IS SO ORDERED.**

**DATED:  March 29, 2022**

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**